1  ROBBINS ARROYO LLP
  BRIAN J. ROBBINS (190264)
2  brobbins@robbinsarroyo.com
  CRAIG W. SMITH (164886)
3  csmith@robbinsarroyo.com
  STEVEN R. WEDEKING (235759)
4  swedeking@robbinsarroyo.com
  600 B Street, Suite 1900
5  San Diego, CA  92101
  Telephone: (619) 525-3990
6  Facsimile: (619) 525-3991

7  Attorneys for Plaintiff

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                    WESTERN DIVISION

11  MICHAEL SCOTT, Derivatively on      )  Case No.
  Behalf of OPUS BANK,                 )
12                                      )  VERIFIED STOCKHOLDER
                                        )  DERIVATIVE COMPLAINT FOR
13                Plaintiff,            )  VIOLATION OF SECURITIES
                                        )  LAW, BREACH OF FIDUCIARY
14        v.                            )  DUTY, WASTE OF CORPORATE
                                        )  ASSETS, AND UNJUST
15  STEPHEN H. GORDON, CURTIS A.        )  ENRICHMENT
  GLOVIER, RICHARD A. SANCHEZ,         )
16  MICHAEL L. MEYER, MARK E.           )
  SCHAFFER, MARK CICIRELLI,            )
17  THOMAS M. BOWERS, DAVID             )
  KING, MICHAEL L. ALLISON,            )
18  NICOLE M. CARRILLO, ROBERT J.       )
  SHACKLETON, MARCOS                   )
19  ALVARADO, and NORMAN B. RICE,       )
                                        )
20                Defendants,           )
                                        )
21        -and-                         )
                                        )
22  OPUS BANK, a California corporation, )
                                        )
23                Nominal Defendant.    )  DEMAND FOR JURY TRIAL

24

25

26

27

28

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the Federal Deposit Insurance Corporation ("FDIC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Opus Bank ("Opus," the "Company," or the "Bank") against certain of its officers and directors for breaches of fiduciary duties and violations of law. These wrongs resulted in hundreds of millions of dollars in damages to Opus' reputation, goodwill, and standing in the business community. Moreover, these actions have exposed the Company to *at least* $17 million in liability for violations of federal law.

2.      Opus is a publicly traded California-chartered commercial bank. According to the Company, Opus is "a regional bank in the western United States providing high-value, relationship-based banking products, services and solutions to [its] clients, which include small and mid-sized companies, entrepreneurs, real estate investors, professionals and high net worth individuals."

3.      Over the last several years, Opus experienced rapid and substantial growth in its Commercial Bank division, including significant growth in the Company's Commercial Bank loan portfolio. Throughout this tremendous growth, the Individual Defendants (as defined herein) repeatedly touted that Opus maintained "ongoing credit oversight," a strong and "disciplined" credit culture, a "conservative" approach to credit, "stringent" and "disciplined" underwriting standards, sufficient loan monitoring procedures, and a "conservative risk profile."

4.      All of the above representations were grossly misleading.  In fact, as the Company was ultimately forced to admit through a slow trickle of announcements beginning in October 2016, Opus: (i) was operating with a material weakness in its internal controls over financial reporting; (ii) held a number of poor quality loans due to inadequate underwriting standards and/or a subpar credit culture; (iii) was unable to maintain robust controls and credit monitoring throughout the substantial growth the Company was experiencing; and (iv) was not properly accounting for its loans.  As a result, in late 2016, Opus was forced to recognize $38.8 million in charge-offs associated with eight low quality loans in the Commercial Bank division, followed by a $69.5 million provision for loan losses in early 2017, which included additional loan charge-offs of $19.2 million.

5.      The Individual Defendants' actions have devastated Opus, as is evident by the Company's ***$522 million***, ***or 44.2%, market capitalization loss*** between October 14, 2016, the last trading day before the truth began to emerge, and January 30, 2017, the day the additional charge-offs and provisions for loan losses were revealed. Further, at least one class action complaint was filed in this Court against the Company and certain Individual Defendants alleging violations of the federal securities laws in connection with various false statements concerning the Company's business and operations (the "Securities Class Action").  On November 10, 2017, Opus announced that the Company had entered into a memorandum of understanding to settle the Securities Class Action for $17 million, pending Court approval.

6.      To make matters worse, on March 18, 2016, the Opus Board of Directors (the "Board") negligently filed a materially misleading Proxy Statement on Schedule 14A (the "Proxy") with the FDIC.  The Proxy urged stockholders to vote to reelect two directors, defendants Michael L. Meyer ("Meyer") and Norman B. Rice ("Rice") to the Board, and elect one other director, defendant Michael L. Allison ("Allison"), as the new management representative on the Board.  The Proxy, however, misleadingly

1  assured investors that the Board adequately oversees Opus' risks and meaningfully
2  implements relevant internal controls.

3     7.     Plaintiff brings this action against the Individual Defendants to repair the
4  harm that they caused with their faithless actions.

5  **JURISDICTION AND VENUE**

6     8.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange
7  Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted
8  herein for violations of section 14(a) of the Exchange Act and U.S. Securities and
9  Exchange Commission Rule 14a-9 promulgated thereunder. This Court has
10  supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

11     9.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among
12  the parties exists and the amount in controversy exceeds $75,000, exclusive of interests
13  and costs.

14     10.     This Court has jurisdiction over each defendant named herein because
15  each defendant is either a corporation that conducts business in and maintains
16  operations in this District, or is an individual who has sufficient minimum contacts
17  with this District to render the exercise of jurisdiction by the District courts permissible
18  under traditional notions of fair play and substantial justice.

19     11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391
20  because: (i) Opus maintains its principal place of business in this District; (ii) one or
21  more of the defendants either resides in or maintains executive offices in this District;
22  (iii) a substantial portion of the transactions and wrongs complained of herein,
23  including the defendants' primary participation in the wrongful acts detailed herein,
24  and aiding and abetting and conspiracy in violation of fiduciary duties owed to Opus,
25  occurred in this District; and (iv) defendants have received substantial compensation in
26  this District by doing business here and engaging in numerous activities that had an
27  effect in this District.

28

## THE PARTIES

**Plaintiff**

12.     Plaintiff Michael Scott was a stockholder of Opus at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Opus stockholder.  Plaintiff is a citizen of Massachusetts.

**Nominal Defendant**

13.     Nominal defendant Opus is a California-chartered commercial bank with principal executive offices located at 19900 MacArthur Boulevard, 12th Floor, Irvine, California.  Accordingly, Opus is a citizen of California.  Opus is a regional bank that provides banking products, services, and solutions to clients through its Retail Bank, Commercial Bank, Merchant Bank and Correspondent Bank divisions.  The Bank operates fifty banking offices, including thirty-one in California, sixteen in the Seattle/Puget Sound region in Washington, two in the Phoenix metropolitan area of Arizona and one in Portland, Oregon.  As of September 30, 2017, Opus had $7.3 billion of total assets, $5.1 billion of total loans, and $6.1 billion in total deposits.  As of December 31, 2016, the Bank employed 835 full-time employees.

**Defendants**

14.     Defendant Stephen H. Gordon ("Gordon") is Opus' Chief Executive Officer, President, Chairman of the Board and a director and has been since September 2010.  Defendant Gordon cofounded the Bank in September 2010.  Defendant Gordon was a member of Opus' Directors' Loan Committee from at least March 2015 to at least March 2016.  Defendant Gordon is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Gordon knowingly, recklessly, or with gross negligence caused or allowed Opus to operate with inadequate internal controls over accounting and financial reporting and made improper statements in the Company's press releases and public filings concerning the Company's: (i) inadequate internal controls; (ii) loan quality, underwriting standards, credit culture, and risk exposure; and (iii) improper accounting

for Opus' loans.  Defendant Gordon also negligently violated section 14(a) of the Exchange Act by causing Opus to make misleading statements in the Proxy.  Opus paid defendant Gordon the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2016 | $800,000 | - | $720,009 | $30,687 | $1,550,696 |
| 2015 | $799,231 | $1,470,000 | $1,000,023 | $30,410 | $3,299,664 |

Defendant Gordon is a citizen of California.

15.     Defendant Curtis A. Glovier ("Glovier") is Opus' Senior Executive Vice President, Head of Wealth Services; Senior Managing Director of the Merchant Banking division; and Chief Executive Officer and Chairman of the Board of PENSCO Services, LLC and PENSCO Trust Company, both wholly-owned subsidiaries of Opus, and has been since August 2016 and a director has been since September 2010. Defendant Glovier was a member of Opus' Directors' Loan Committee in at least May 2017, and a member of the Audit and Risk Committee from at least March 2015 to at least March 2016.  Defendant Glovier knowingly, recklessly, or with gross negligence caused or allowed Opus to operate with inadequate internal controls over accounting and financial reporting and made improper statements in the Company's press releases and public filings concerning the Company's: (i) inadequate internal controls; (ii) loan quality, underwriting standards, credit culture, and risk exposure; and (iii) improper accounting for Opus' loans.  Defendant Glovier also negligently violated section 14(a) of the Exchange Act by causing Opus to make misleading statements in the Proxy. Opus paid defendant Glovier the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2016 | $211,538 | $350,000 | $900,010 | $12,468 | $1,474,016 |

Defendant Glovier is a citizen of New Jersey.

16.     Defendant Richard A. Sanchez ("Sanchez") is Opus' Executive Vice President and has been since September 2010 and Corporate Secretary and has been since at least March 2014. Defendant Sanchez was also Opus' Chief Administrative Officer from September 2010 to at least May 2017; Chief Risk Officer from September 2010 to May 2016; and a director from September 2010 to April 2016. Defendant Sanchez was a member of Opus' Directors' Loan Committee from at least March 2015 to April 2016. Defendant Sanchez knowingly, recklessly, or with gross negligence caused or allowed Opus to operate with inadequate internal controls over accounting and financial reporting and made improper statements in the Company's press releases and public filings concerning the Company's: (i) inadequate internal controls; (ii) loan quality, underwriting standards, credit culture, and risk exposure; and (iii) improper accounting for Opus' loans. Defendant Sanchez also negligently violated section 14(a) of the Exchange Act by causing Opus to make misleading statements in the Proxy. Defendant Sanchez is a citizen of California.

17.     Defendant Meyer is an Opus director and has been since September 2010. Defendant Meyer is a member of Opus' Audit Committee and Risk Oversight Committee and has been since May 2017.[1] Defendant Meyer was a member of Opus' Audit and Risk Committee and Directors' Loan Committee from at least March 2015 to May 2017. Defendant Meyer knowingly or recklessly caused or allowed Opus to operate with inadequate internal controls over accounting and financial reporting and made improper statements in the Company's press releases and public filings concerning the Company's: (i) inadequate internal controls; (ii) loan quality, underwriting standards, credit culture, and risk exposure; and (iii) improper accounting for Opus' loans. Opus paid defendant Meyer the following compensation as a director:

---

[1] On May 22, 2017, the Audit and Risk Committee and Directors' Loan Committee were both discontinued, and the Audit Committee and the Risk Oversight Committee were created.

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $114,500 | $60,022 | $174,522 |
| 2015 | $92,500 | $30,035 | $122,535 |

Defendant Meyer is a citizen of California.

18.     Defendant Mark E. Schaffer ("Schaffer") is an Opus director and has been since September 2010.  Defendant Schaffer is a member of Opus' Audit Committee and Risk Oversight Committee and has been since May 2017.  Defendant Schaffer was Chair of Opus' Directors' Loan Committee from at least March 2015 to May 2017, and a member of the Audit and Risk Committee from March 2015 to May 2017. Defendant Schaffer knowingly or recklessly caused or allowed Opus to operate with inadequate internal controls over accounting and financial reporting and made improper statements in the Company's press releases and public filings concerning the Company's: (i) inadequate internal controls; (ii) loan quality, underwriting standards, credit culture, and risk exposure; and (iii) improper accounting for Opus' loans. Defendant Schaffer also negligently violated section 14(a) of the Exchange Act by causing Opus to make misleading statements in the Proxy.  Opus paid defendant Schaffer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $120,000 | $60,022 | $180,022 |
| 2015 | $111,875 | $30,035 | $141,910 |

Defendant Schaffer is a citizen of California.

19.     Defendant Mark Cicirelli ("Cicirelli") is an Opus director and has been since March 2012.  Defendant Cicirelli is a member of Opus' Audit Committee and Risk Oversight Committee and has been since May 2017.  Defendant Cicirelli was a member of Opus' Audit and Risk Committee from March 2015 to May 2017. Defendant Cicirelli knowingly or recklessly caused or allowed Opus to operate with inadequate internal controls over accounting and financial reporting and made improper statements in the Company's press releases and public filings concerning the

Company's: (i) inadequate internal controls; (ii) loan quality, underwriting standards, credit culture, and risk exposure; and (iii) improper accounting for Opus' loans. Defendant Cicirelli also negligently violated section 14(a) of the Exchange Act by causing Opus to make misleading statements in the Proxy. Defendant Cicirelli is a citizen of New York.

20.   Defendant Thomas M. Bowers ("Bowers") is an Opus director and has been since June 2016. Defendant Bowers knowingly or recklessly caused or allowed Opus to operate with inadequate internal controls over accounting and financial reporting and made improper statements in the Company's press releases and public filings concerning the Company's: (i) inadequate internal controls; (ii) loan quality, underwriting standards, credit culture, and risk exposure; and (iii) improper accounting for Opus' loans. Defendant Bowers is a citizen of Connecticut.

21.   Defendant David King ("King") is an Opus director and has been since October 2016. Defendant King is a member of Opus' Audit Committee and Risk Oversight Committee and has been since May 2017. Defendant King was a member of Opus' Audit and Risk Committee in at least May 2017. Defendant King knowingly or recklessly caused or allowed Opus to operate with inadequate internal controls over accounting and financial reporting and made improper statements in the Company's press releases and public filings concerning the Company's: (i) inadequate internal controls; (ii) loan quality, underwriting standards, credit culture, and risk exposure; and (iii) improper accounting for Opus' loans. Defendant King is a citizen of New Jersey.

22.   Defendant Allison was Opus' Co-President of the Bank from March 2013 to December 2016; President of Opus' Commercial Bank from July 2013 to December 2016; a director from April 2016 to December 2016; and Executive Vice President and Chief Credit Officer from August 2011 to March 2013. Defendant Allison is also a consultant and has been since January 2017. Defendant Allison was a member of Opus' Directors' Loan Committee from April 2016 to December 2016. Defendant Allison is named as a defendant in a related securities class action complaint that

alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Allison knowingly, recklessly, or with gross negligence caused or allowed Opus to operate with inadequate internal controls over accounting and financial reporting and made improper statements in the Company's press releases and public filings concerning the Company's: (i) inadequate internal controls; (ii) loan quality, underwriting standards, credit culture, and risk exposure; and (iii) improper accounting for Opus' loans. Defendant Allison also negligently violated section 14(a) of the Exchange Act by causing Opus to make misleading statements in the Proxy. Opus paid defendant Allison the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2015 | $466,154 | $325,000 | $300,007 | $21,760 | $1,112,921 |

Defendant Allison is a citizen of California.

23.   Defendant Nicole M. Carrillo ("Carrillo") was Opus' Executive Vice President and Chief Financial Officer from August 2013 to November 2017 and Senior Vice President and Chief Accounting Officer from January 2011 to August 2013. Defendant Carrillo is also a consultant and has been since November 2017. Defendant Carrillo knowingly, recklessly, or with gross negligence caused or allowed Opus to operate with inadequate internal controls over accounting and financial reporting and made improper statements in the Company's press releases and public filings concerning the Company's: (i) inadequate internal controls; (ii) loan quality, underwriting standards, credit culture, and risk exposure; and (iii) improper accounting for Opus' loans. Opus paid defendant Carrillo the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2016 | $350,000 | - | $200,020 | $24,052 | $574,072 |
| 2015 | $348,462 | $150,000 | $200,005 | $20,729 | $719,196 |

Defendant Carrillo is a citizen of California.

24.     Defendant Robert J. Shackleton ("Shackleton") was an Opus director from September 2010 to August 2017.  Defendant Shackleton is also Opus' Director Emeritus and a consultant and has been since August 2017.  Defendant Shackleton was the Chair of Opus' Audit and Risk Committee from at least March 2015 to at least May 2017, and a member of the Directors' Loan Committee from at least March 2015 to at least May 2017.  Defendant Shackleton knowingly or recklessly caused or allowed Opus to operate with inadequate internal controls over accounting and financial reporting and made improper statements in the Company's press releases and public filings concerning the Company's: (i) inadequate internal controls; (ii) loan quality, underwriting standards, credit culture, and risk exposure; and (iii) improper accounting for Opus' loans.  Defendant Shackleton also negligently violated section 14(a) of the Exchange Act by causing Opus to make misleading statements in the Proxy.  While in possession of material, nonpublic information concerning Opus' true business health, defendant Shackleton sold 4,000 shares of his stock for $137,600 in proceeds.  Opus paid defendant Shackleton the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|:-----------:|:-----------------:|:------------:|:-----:|
| 2016 | $125,000 | $60,022 | $185,022 |
| 2015 | $112,500 | $30,035 | $142,535 |

Defendant Shackleton is a citizen of California.

25.     Defendant Marcos Alvarado ("Alvarado") was an Opus director from June 2011 to June 2016.  Defendant Alvarado knowingly or recklessly caused or allowed Opus to operate with inadequate internal controls over accounting and financial reporting and made improper statements in the Company's press releases and public filings concerning the Company's: (i) inadequate internal controls; (ii) loan quality, underwriting standards, credit culture, and risk exposure; and (iii) improper accounting for Opus' loans.  Defendant Alvarado is a citizen of New York.

26.     Defendant Rice was an Opus director from February 2014 to October 2016.  Defendant Rice knowingly or recklessly caused or allowed Opus to operate with

inadequate internal controls over accounting and financial reporting and made improper statements in the Company's press releases and public filings concerning the Company's: (i) inadequate internal controls; (ii) loan quality, underwriting standards, credit culture, and risk exposure; and (iii) improper accounting for Opus' loans.  Opus paid defendant Rice the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $80,625 | $30,035 | $110,660 |

Defendant Rice is a citizen of Washington.

27.     The defendants identified in ¶¶14-16, 22-23 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶14-22, 24-26 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶15, 17-19, 21, 24 are referred to herein as the "Audit and Risk Committee Defendants."  The defendants identified in ¶¶14-18, 22, 24 are referred to herein as the "Directors' Loan Committee Defendants."  Collectively, the defendants identified in ¶¶14-26 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

28.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Opus and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Opus in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Opus and not in furtherance of their personal interest or benefit.

29.     To discharge their duties, the officers and directors of Opus were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Opus were required to, among other things:

(a)     ensure that the Company operated with adequate internal controls over financial reporting;

(b)     ensure that the Company operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(c)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and refrain from engaging in deceptive or fraudulent conduct;

(d)     ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management;

(e)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(f)     remain informed as to how Opus conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(g)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Additional Duties of the Audit and Risk Committee Defendants**

30.     In addition to these duties, under its Charter in effect since April 2014, the Audit and Risk Committee Defendants, defendants Glovier, Meyer, Schaffer, Shackleton, Cicirelli, and King, owed specific duties to Opus to:

[A]ssist[] the Board in (i) overseeing the operation of a comprehensive system of internal controls covering the integrity of the Bank's financial statements and reports, compliance with laws, regulations, and corporate policies, and the qualification, performance and independence of the

Bank's registered public accounting firm (the "Independent Auditor"), and (ii) fulfilling its oversight responsibilities relating to the Bank's assessment and management of risk.

Moreover the Audit and Risk Committee's Charter provides that the Audit and Risk Committee is required to: (i) "Review and discuss with management and the Independent Auditor, to the extent applicable to the Bank, management's report on internal control over financial reporting and the Independent Auditor's attestation of such report"; and (ii) "Discuss guidelines and policies that govern the process by which risk assessment and risk management are handled by the Bank.  Be responsible for reviewing and discussing with management the Bank's assessment and management of risk, including market, operational, fiduciary, interest rate, liquidity, business and credit risks, and related policies."

**Additional Duties of the Directors' Loan Committee Defendants**

31.    Under its Charter in effect since April 2014, the Directors' Loan Committee Defendants, defendants Allison, Glovier, Gordon, Meyer, Sanchez, Schaffer, and Shackleton, owed specific additional duties to Opus to "oversee the Bank's credit and lending strategies and to review and approve loans and lending relationships that exceed Board-approved management lending authority."  Moreover the Directors' Loan Committee Charter provides that the Directors' Loan Committee: (i) has "the authority to obtain advice and assistance from internal and external legal, accounting or other advisors"; (ii) has "access to the Bank's management for research, consultation and advice on all of the matters contained in th[e] Charter"; and (iii) is required to "review new strategies to develop and achieve the credit and lending goals of the Bank."

**Breaches of Duties**

32.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Opus, the absence of good faith on their part, and a reckless disregard for their duties to the

Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

33.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in unlawful and unsafe business practices, improper practices that wasted the Company's assets, and caused Opus to incur substantial damage.

34.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Opus, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.   The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Opus has expended, and will continue to expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

35.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

36.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Opus, regarding the Individual Defendants' management of Opus' operations; and (ii) enhance the Individual Defendants' executive and directorial positions at Opus and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

37.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

38.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

39.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

40.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## **FACTUAL BACKGROUND**

41.    For years, Opus experienced rapid and substantial growth in its Commercial Bank division, including significant growth in the Company's Commercial Bank loan portfolio.  Unfortunately, unbeknownst to the public as a result of the Individual Defendants' misleading statements, much of this growth was attributable to risky loans that were approved with poor underwriting standards, an inadequate approach to credit, and lackluster loan monitoring procedures.  As detailed below, despite these glaring problems, over the span of two years the Individual Defendants

repeatedly misrepresented that Opus maintained a conservative credit culture that was strong and disciplined, implemented stringent underwriting standards, and carefully monitored the Company's loan portfolio and procedures to maintain a conservative risk profile.

## IMPROPER STATEMENTS

42.     On January 26, 2015, the Opus held an earnings call with investors and analysts to discuss its fourth quarter and full year 2014 financial results.  During the call, defendants Gordon and Allison boasted that Opus' growth was purportedly backed by Opus' strong credit discipline and credit culture.  Defendants Gordon and Allison stated:

> [Defendant Gordon:]  **We have continued to grow client relationships while maintaining discipline and credit culture.** And we're pleased that our commercial business and specialty banking divisions all contributed to the **strong origination levels this quarter**, including from healthcare, technology, corporate finance, commercial business, structured finance and institutional syndications, representing 36% of our new loan fundings during the quarter, and 57% of our pipeline as of January 1, 2015.
>
> \* \* \*
>
> Our **strong growth**, record new loan fundings, high-quality deposits, **continued discipline and unwavering approach to credit,** strong capital ratios, and scalable Business have us **confident in our prospects** as we enter 2015.
>
> \* \* \*
>
> [Defendant Allison:]  **Along with our growing originations, we continued to maintain our focus on credit culture.... We continue to maintain our stringent, disciplined underwriting standards on our entire portfolio**, a discipline that anticipates potential client issues, and allows us the opportunity to address those issues."

43.     On February 27, 2015, Opus filed with the FDIC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2014 (the "2014

Form 10-K").  The 2014 Form 10-K was signed by Officer Defendants Gordon, Carrillo, and Sanchez, and Director Defendants Gordon, Alvarado, Cicirelli, Meyer, Rice, Sanchez, Schaffer, Shackleton, and Glovier.  The 2014 Form 10-K touted that one of Opus' one of its "competitive strengths" was the Company's "conservative risk profile," noting that the Company "maintain[ed] a conservative credit culture with strict underwriting standards" and a "talented management team."  The 2014 Form 10-K further stated that the Company's growth would "provide [Opus] with attractive risk-adjusted returns."  The 2014 Form 10-K stated:

**Our competitive strengths**

We believe that we are well-positioned to achieve our objectives, particularly as a result of the following competitive strengths:

* * *

- *Experienced management team with a successful track record.* We are led by Mr. Gordon, who has attracted a *talented management team with significant banking experience* and proven track records of successfully growing banking institutions. Several of our executives and relationship managers previously worked with Mr. Gordon at Commercial Capital Bancorp, Inc. and Fremont General Corporation, while other executives and members of our senior management team have experience in other large, mid-sized and small financial institutions. Through this experienced team, we believe that we have created an entrepreneurial culture that is *keenly focused on our clients and on executing our growth strategy.* We perpetuate this entrepreneurial culture through various initiatives, including weekly senior management and sales meetings and an open floor plan to encourage collaboration between divisions.

* * *

- *Conservative risk profile*. *We maintain a conservative credit culture with strict underwriting standards.* We have experienced only $203,000 in credit losses on the $4.3 billion of loans that we have originated since the Bay Cities Reorganization. Our $466.0 million acquired loan portfolio, which represents 11.4% of our loan balances as of December 31, 2014, was marked to fair value at

acquisition and we have built a dedicated Special Credits Group focused on successfully managing and exiting problem loans to achieve the highest possible return. In addition, **we maintain a conservative amount of capital and liquidity**. Our regulatory capital ratios for the year ended December 31, 2014 of 13.26% Tier 1 capital, 13.87% total capital and 11.29% Tier 1 leverage capital are all well above required regulatory thresholds.

\* \* \*

**Our business strategy**

\* \* \*

- *Grow banking divisions and business lines.* We are developing and growing niche banking products and services through the Merchant Bank, Correspondent Bank, Healthcare Banking, Technology Banking, Business Banking, Real Estate Capital Markets and Structured Finance, **which we believe will provide us with attractive risk-adjusted returns.**

44.    On April 27, 2015, Opus held an earnings call to discuss its first quarter 2015 financial results.   During the call, defendants Gordon and Allison again emphasized the Bank's growth while improperly assuring the market that such growth was backed by a disciplined credit culture, stringent underwriting standards, and positive portfolio trends, stating:

[Defendant Gordon:]  The first quarter saw a marked increase in the contribution of new loan fundings from our Commercial business and Specialty Banking Divisions."

\* \* \*

[Defendant Allison:] ***Along with our ambition to grow originations, we continue to emphasize a focused and disciplined credit culture.... We continue to maintain stringent underwriting standards across our lending platforms; and our ongoing credit oversight is a partnership with our clients to be aware of and act on their ongoing results.***

\* \* \*

And maybe just to give you a little more color, while we're talking about

- 18 -

allowance and provisioning, our total criticized loans for the quarter were actually lower than they were at year-end. ***So the portfolio trends continue to remain positive….***

45.   On May 8, 2015, Opus filed with the FDIC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2015, signed by defendants Gordon and Carrillo.   The Form 10-Q again touted the Company's significant growth and misrepresented that Opus implemented stringent underwriting criteria and monitoring procedures, including with respect to the Company's commercial business loans.  The Form 10-Q stated:

> Over the past three years, ***we have experienced significant growth in our originated loan portfolio*** while our acquired loan portfolio has continued to runoff as a result of pay downs, workouts and normal loan payment amortization. Within the originated loan portfolio, our primary focus has been on multifamily residential, commercial real estate and commercial business lending, which represented 96% of the total originated loan portfolio at March 31, 2015. ***We expect to continue to grow our loan portfolio with a focus on these three lending areas as part of our strategic plan.*** Due to the concentration in real estate loans that is the result of our growth over the last three years, ***we have put into place stringent underwriting criteria related to our commercial real estate and multifamily residential loans, as well as monitoring procedures, including quarterly market evaluations and semi-annual loan portfolio stress testing. We have also emphasized our funding strategy towards commercial business loans with similar stringent underwriting criteria and monitoring procedures as part of our efforts to further diversify our originated portfolio.***

46.   On July 27, 2015, Opus held an earnings call to discuss its second quarter 2015 financial results.  Defendant Gordon reiterated the Company's purportedly strong performance and growth in its Commercial Bank, stating "[s]trong performance from our Commercial and Specialty banking divisions, which represented 47% of [Opus'] new-loan fundings during the quarter, contributed to 172% annual growth in originated commercial business-loan portfolio and 6 basis points of expansion in the yield on [Opus'] originated-loan portfolio." Defendant Gordon further reassured investors that the growth was achieved with a strong

commitment to quality credit standards and that he was confident these trends would continue, stating "[Opus'] strong growth in fee income, new-loan fundings, high-quality deposits, *conservative approach to credit*, strong capital ratios and scalable business ha[s] [the Company] *confident about the second half of 2015 and on into 2016*." Defendant Allison similarly assured that "*[w]hile [Opus] continue[d] to maintain [its] stringent disciplined underwriting standards on [its] entire portfolio, the management of credit risk in the specialty-banking portfolios that [it] originate[s] is ongoing* and [it] will see some risk-rating migrations as [Opus'] entire portfolio continues to season."

47.    The July 27, 2015 earnings call also featured a question and answer session, wherein analysts specifically questioned the Company's credit trends and the quality of its assets. In response, defendant Allison assured investors that trends were positive, stating:

> [Analyst:] …And then asset quality, could you tell us what is your classified or special mention loan levels? Or also give us more color on the risk migration that you had referenced. Your non-accruals are very low. Your charge-offs are non-existent. So in order to build up a reserve, you have to specifically identify factors that maybe because of your blank slate reserve coverage. Maybe you can tell us what factors you were able to identify to help you build up the reserve this quarter?

> [Defendant Allison:] …[I]t's really two components. So as the credit transitions to a more challenged risk rate, we, in our ALLL, ascribe a higher loss content expectation. So it's coming from that. And then for loans that are criticized classified that deserve a special reserve, we do that analytic as well.

> *   *   *

> [Analyst:] And then so I guess I'm also double checking that there's no kind of credit trend or anything that you're seeing in the marketplace, beyond just your methodology that you're applying to your portfolio of natural accretion?

> [Defendant Allison:] *No, we are not really seeing that.*

48.     On August 7, 2015, Opus filed with the FDIC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2015, signed by defendants Gordon and Carrillo.  The Form 10-Q again boasted about Opus' significant growth, stringent underwriting criteria, and diligent monitoring procedures, stating:

> We have experienced **significant growth in our originated loan portfolio** while our acquired loan portfolio has continued to run off as a result of pay downs, workouts and normal loan payment amortization. Within the originated loan portfolio, our primary focus has been on multifamily residential, commercial real estate and commercial business lending, which represented 96% of the total originated loan portfolio at June 30, 2015. **We expect to continue to grow our loan portfolio** with a focus on these three lending areas as part of our strategic plan. Due to the concentration in real estate loans that is the result of our growth over the last three years, we have put into place stringent underwriting criteria related to our commercial real estate and multifamily residential loans, as well as monitoring procedures, including quarterly market evaluations and semi-annual loan portfolio stress testing. We have also emphasized our funding strategy towards commercial business loans with similar **stringent underwriting criteria and monitoring procedures** as part of our efforts to further diversify our originated portfolio.

> \*   \*   \*

> **Credit Quality Monitoring**

> As part of the Company's credit policies, annual reviews at a minimum are performed on multifamily, commercial real estate, construction, land and commercial business loans with commercial business loans more typically reviewed on a quarterly basis. As part of the annual review of borrowers, financial statements of the property and/or borrowing entity are reviewed including occupancy levels, revenue and expenses to determine any variation from expected performance or deterioration in the underlying credit risk of the loan. The risk rating assigned to each loan is adjusted based on the updated information. **The Company actively monitors loans that management believes indicate additional potential credit risk. Each acquired loan portfolio is reviewed within a short period of time following the acquisition to determine whether the loan portfolio classification is consistent with the Company's internal risk rating standards.**

49.    On October 26, 2015, Opus held an earnings call to discuss its third quarter 2015 financial results.  Defendants again touted the Company's significant growth while assuring investors that loans were conservatively scrutinized for credit quality.  For example, defendant Gordon proclaimed that the Individual Defendants were " proud of Opus' industry leading growth, [while the Company] *remain[ed] focused on* profitability and *maintaining [its] strong credit culture.*"   Defendant Gordon further trumpeted that the Company's "quarterly new loan fundings, high quality deposits, *conservative approach to credit*, strong capital ratios and scalable business g[a]ve [the defendants] confidence as [Opus] head[ed] towards 2016." Defendant Allison added, "[A]s [Opus] continue[s] to find success growing originations, *[it is] maintaining [its] focus on disciplined credit culture.*"   Further, during the question and answer session, defendants Allison and Gordon both assured investors that there were no negative trends in the Company's portfolio when questioned about recent increases in nonperforming loans, stating:

> [Defendant Allison:] …I would say, though, that our practice is to set covenant expectations at a relatively aggressive level, and so as we see companies failing to achieve, if you will, to that standard I won't say we're quick *but we're not hesitant to down grade the relationship, and while we don't necessarily expect that to culminate in credit loss,* that  aggressiveness does impact the allowance.
>
> *   *   *
>
> [Defendant Gordon:] …[J]ust like a year ago in the third quarter of 2014, *we do not at all view this, the movement that we had during the quarter as some sort of trend for people to extrapolate from.*

50.    On November 6, 2015, Opus filed with the FDIC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2015, signed by defendants Gordon and Carrillo.  The Form 10-Q again touted the Company's significant growth and again reassured investors that such growth was backed by purportedly "stringent underwriting criteria and monitoring procedures," stating:

We have experienced *significant growth in our originated loan portfolio* while our acquired loan portfolio has continued to decrease as a result of loan sales, pay downs, workouts and normal loan payment amortization. Within the originated loan portfolio, our primary focus has been on multifamily residential, commercial real estate and commercial business lending, which represented 96% of the total originated loan portfolio at September 30, 2015. We expect to continue to grow our loan portfolio with a focus on these three lending areas as part of our strategic plan. Due to the concentration in real estate loans that is the result of our growth, we have put into place *stringent underwriting criteria* related to our commercial real estate and multifamily residential loans, *as well as monitoring procedures, including quarterly market evaluations and semi-annual loan portfolio stress testing.*

We have also emphasized our funding strategy towards commercial business loans with *similar stringent underwriting criteria and monitoring procedures* as part of our efforts to further diversify our originated portfolio.

51.    On December 1, 2015, Opus released its Quarterly Performance Update report for the third quarter ended September 30, 2015.   The report touted "industry leading growth" and assured investors that recent changes in reserves and risk rating migrations were merely the result of the Company's conservative approach to credit, stating:

> *As Opus continues to achieve industry-leading growth rates in loans and deposits, it remains focused on profitability and maintaining a disciplined credit culture.*

> \* \* \*

> Provision expense for the third quarter of 2015 was $7.6 million, up $1.8 million over the linked quarter. The third quarter provision was driven by loan growth ($2.3 million) and changes in specific reserves, individual risk ratings and loss factors ($6 million), offset by a provision recapture on the acquired loan portfolio ($709,000).

> *Importantly, quarterly changes in specific reserves and individual risk rating migrations were related to loans from various banking divisions and are largely attributable to Opus' conservative credit culture, which prescribes stringent covenant expectations and robust*

- 23 -

*monitoring processes, enabling management to make proactive and comprehensive credit risk decisions.*  Such trends were anticipated and previously guided, as the growing Commercial and Specialty Banking divisions' portfolios continue to season.  *Opus' credit infrastructure was established to ensure it stays ahead of situations that may or may not result in past due payments or credit loss.*

52.     On January 25, 2016, Opus held an earnings call to discuss its fourth quarter and full year 2015 financial results.  During the call, defendants again bragged about the Company's exceptional growth which was purportedly backed by a strong and conservative credit culture.  For example, defendant Gordon highlighted the Company's impressive "new loan fundings" for the quarter and full year, while assuring investors that the Bank remained committed to credit quality even during rapid growth periods, explaining: "While [Opus is] proud of [its] industry-leading growth, [the Company] remain[s] *focused on* profitability and *maintaining [its] strong credit culture*."   Defendant Gordon further boasted that "[Opus'] record quarterly new loan fundings, better than expected annual new loan fundings, growth and improving mix of high quality deposits, *continued conservative approach to credit*, strong capital ratios, and scalable business give [it] confidence as we head into 2016."  Similarly, defendant Allison touted:

> As we continue to find success growing originations, we also continue to maintain our focus on a disciplined credit culture, including active portfolio management....  The increase in non-performing assets during the fourth quarter was driven by one loan relationship, for which Opus has confirmed there is sufficient collateral to cover expected future inherent loss.

53.     Further, when specifically questioned regarding what factors were driving the Company's increase in reserves, defendant Allison brushed off concerns, explaining:

> It's actually, it's two loans to one relationship, and it's totally, completely collateralized. *And so the loss content isn't something that we're worried about*. But you're seeing it in and reflected by our allowance,

our [nonperforming asset], our criticized, our classifieds, because they are  large  loans relative to the size of our book.

54.     On February 29, 2016, Opus filed with the FDIC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2015 (the "2015 Form 10-K").   The 2015 Form 10-K was signed by Officer Defendants Gordon, Carrillo, and Sanchez, and Director Defendants Gordon, Alvarado, Cicirelli, Glovier, Meyer, Rice, Sanchez, Schaffer, and Shackleton.   The 2015 Form 10-K again highlighted the Company's "significant growth" while assuring that Opus had "stringent underwriting criteria … and monitoring procedures," stating:

> Over the past three years, ***we have experienced significant growth in our originated loan portfolio*** while our acquired loan portfolio has continued to runoff as a result of loan sales, pay downs, workouts and normal loan payment amortization. Within the originated loan portfolio, our primary focus has been on multifamily residential, commercial real estate and commercial business lending, which represented 97% of the total originated loan portfolio as of December 31, 2015. We expect to continue to grow our loan portfolio with a focus on these three lending areas as part of our strategic plan. ***We have put into place stringent underwriting criteria related to our commercial real estate, multifamily residential and commercial business loans, including stress, downside and break-even analysis, as well as monitoring procedures, including quarterly market evaluations and semi-annual loan portfolio stress testing. We believe such processes have addressed the credit risks associated with our higher concentration in real estate loans as a result of our growth over the last three years.*** Additionally, we have focused our lending efforts during 2015 towards commercial business loans in order to diversify our loan portfolio, as evident by the amount of commercial business loan fundings in comparison to commercial real estate and multifamily loans.

55.     On April 1, 2016, Opus  released its Quarterly Performance Update report for the fourth quarter and fiscal year ended December 31, 2015.  The report continued to boast about the Company's impressive growth, with assurances that Opus was committed to a strong credit culture to minimize risk, stating:

**CREDIT QUALITY**

*As Opus continues to achieve industry-leading growth rates in loans and deposits, it remains focused on profitability and maintaining a disciplined credit culture*....   The increase in nonperforming assets during the fourth quarter of 2015 was driven by a single loan relationship for which Opus has confirmed it has sufficient collateral to cover expected future inherent loss.

Provision expense was $8.0 million for the fourth quarter of 2015, up $419,000 over the linked quarter.  The fourth quarter provision was driven by loan growth ($3.7 million) and changes in specific reserves, individual risk ratings and loss factors ($4.7 million), offset by a provision recapture on the acquired loan portfolio ($359,000).   The provision for changes in specific reserves and risk ratings during the fourth quarter of 2015 was predominately additional amounts of existing problem assets for activity in the fourth quarter of 2015 and not related to newly identified problem assets during the quarter.

*Importantly, quarterly changes in specific reserves and individual risk rating migrations were related to loans from various banking divisions and are largely attributable to Opus' conservative credit culture, which prescribes stringent covenant expectations and robust monitoring processes*, enabling management to make proactive and comprehensive credit risk decisions.

56.     On April 25, 2016, Opus held an earnings call to discuss the Company's first quarter 2016 financial results.  Defendants Gordon and Allison again touted that the Company maintained a purportedly strong and conservative credit culture throughout its continuing growth, while again stressing that there were no negative trends in Opus' credit quality.  Defendants Gordon and Allison stated:

[Defendant Gordon:]  *While we're proud of Opus' industry-leading growth* and the successes we're seeing in diversifying our revenue stream, *we remain focused on ... maintaining our strong credit culture.*

\* \* \*

Our record levels of first-quarter new loan fundings and commitments originated, our increasingly high-quality deposit banks, *continued conservative approach to credit*, strong capital position, and scalable

business give us confidence that 2016 will result in an even stronger performance than 2015's results.

\* \* \*

[Defendant Allison:]  The linked-quarter increase in nonperforming assets was attributable to one loan relationship in our tech portfolio that is current but was placed on nonaccrual due to developments during the quarter, and did not result in a need for any additional allowance. ***I do want to stress that this quarter's increase in NPA ratio was not seen as an indication of a trend in our credit quality.***

***We continue to maintain our focus on a disciplined approach to credit that includes active portfolio management and may include quarter-to-quarter changes in risk or accrual based on our stringent proactive underwriting standards.***

57.     On May 6, 2016, Opus filed with the FDIC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2016, signed by defendants Gordon and Carrillo.   The Form 10-Q again improperly provided assurances that in spite of significant growth, the Company's underwriting criteria remained stringent and loans were well monitored, stating:

We have experienced ***significant growth in our originated loan portfolio*** while our acquired loan portfolio has continued to decrease as a result of loan sales, prepayments, and normal loan payment amortization. Within the originated loan portfolio, our primary focus has been on multifamily residential, commercial real estate and commercial business lending, which represented 96% of the total originated loan portfolio at March 31, 2016. We expect to continue to grow our loan portfolio with a focus on these three lending areas as part of our strategic plan. Due to the concentration in real estate loans that is the result of our growth, ***we have put into place stringent underwriting criteria related to our commercial real estate and multifamily residential loans, as well as monitoring procedures, including quarterly market evaluations and semi-annual loan portfolio stress testing. We have also emphasized our funding strategy towards commercial business loans with similar stringent underwriting criteria and monitoring procedures as part of our efforts to further diversify our originated portfolio.***

58.     On May 16, 2016, Opus released its Quarterly Performance Update report for the first quarter ended March 31, 2016, assuring investors that the Company was committed to maintaining a strong credit culture while significantly growing its portfolio, stating:

> *As Opus continues to achieve industry-leading growth rates in loans and deposits, it remains focused on maintaining a disciplined credit culture.*
>
> * * *
>
> *Importantly, quarterly changes in specific reserves and individual risk rating migrations were related to loans from various banking divisions and are largely attributable to Opus' conservative credit culture*, *which prescribes stringent covenant expectations and active monitoring processes*, enabling management to make proactive and comprehensive credit risk decisions.

59.     On July 25, 2016, Opus issued a press release announcing earnings for the second quarter of 2016, "marked by record second quarter loan fundings [and] continued strong growth in … loans."   According to defendant Gordon, the quarter was "marked by elevated provision for potential loan losses associated with Opus' Technology Banking division loans, as well as provisions required due to [its] record second-quarter new loan fundings and continued success shifting the mix of [Opus'] loan portfolio more heavily towards C&I loans."   Nonetheless, defendant Gordon assured that the Company would "deemphasize [its] Technology Banking niche lending focus for the foreseeable future, and thereby unleash Opus' true earnings potential."   Defendant Gordon further concluded that "[s]trong growth within Opus' other Commercial and Specialty Banking divisions and its Income Property Banking division continue to drive strong risk-adjusted returns and result in no change to Opus' previously established growth goals."

60.     Also on July 25, 2016, Opus held an earnings call to discuss its second quarter 2016 financial results.  In spite of the reported issues within Opus'

technology portfolio, the defendants again emphasized the Company's growth and purportedly exceptional credit quality.  For example, as stated by defendant Allison:

> Excluding the technology banking division's credit issues, ***our credit quality continues to perform consistent with expectations*** as our portfolio of multi-family, CRE and C&I loans continues to season.  To put some figures around that statement, if you exclude technology banking division loans from the calculation, our NPA ratio would've been 43 basis points for the second quarter compared to 32 basis points in the first quarter, again excluding tech.  We believe our proactive and timely decision to deemphasize our tech lending niche focus will result in ***a return to the credit profile that we have expected over the course of Opus' evolution.    That is to say we continue to maintain our focus on a disciplined approach to credit that includes active portfolio management and may include quarter-to-quarter change in risk ratings or accrual status based on our stringent proactive underwriting standards.***

61.    On August 3, 2016, Opus hosted a KBW Community Bank Conference call.  During the call, defendant Allison boasted that ***"[s]o far the credit metrics have held up as we have ambitiously grown over the years."***

62.    The defendants continued to tout the same message two days later on August 5, 2016, when Opus filed with the FDIC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2016, signed by defendants Gordon and Carrillo. The Form 10-Q reiterated that Opus "ha[d] experienced significant growth in [its] originated loan portfolio" and ***"ha[d] also emphasized [the Company's] funding strategy towards commercial business loans with similar stringent underwriting criteria and monitoring procedures as part of [its] efforts to further diversify our originated portfolio."***

## THE MATERIALLY MISLEADING PROXY

63.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the below noted defendant.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims

any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

64.     On March 18, 2016, defendants Sanchez, Rice, Allison, Gordon, Meyer, Shackleton, Schaffer, Cicirelli, Glovier, and Alvarado caused Opus to issue the Proxy in connection with the 2016 Annual Stockholders meeting, held on April 28, 2016.  In the Proxy, defendants solicited stockholder votes to, among other things, reelect defendants Meyer and Rice to the Board, and elect defendant Allison as the new management representative on the Board.  Defendants issued materially misleading statements with respect to the solicited vote.

65.     The Proxy stated the following in support of reelecting defendants Meyer and Rice, and electing defendant Allison to the Board:

**Corporate Governance Principles and Board Matters**

Corporate Governance Guidelines. ***We are committed to having sound corporate governance principles***, which are essential to running our business efficiently and maintaining our integrity in the marketplace. Our Board of Directors has adopted Corporate Governance Guidelines, that set forth the framework within which our Board of Directors, assisted by the committees of our Board of Directors, directs the affairs of our organization. The Corporate Governance Guidelines address, among other things, the composition and functions of our Board of Directors, director independence, compensation of directors, management succession and review, committees of our Board of Directors and selection of new directors. Our Corporate Governance Guidelines are available on our website at www.opusbank.com under the "Investor Relations" tab.

\*   \*   \*

**Risk Management and Oversight**

***Our Board of Directors oversees our risk management process, which is a company-wide approach to risk management that is carried out by our management. Our full Board of Directors determines the appropriate risk for us generally, assesses the specific risks faced by us, and reviews the steps taken by management to manage those risks.*** While our full Board maintains the ultimate oversight responsibility for

the risk management process, its committees oversee risk in specified areas, which are described below.

\* \* \*

*Audit and Risk Committee.* **The Audit and Risk Committee assists our Board of Directors in fulfilling its responsibilities for general oversight of the integrity of our financial statements,** the independent auditors' qualifications and independence, **the performance of our internal audit function** and independent auditors, **and risk assessment and risk management.** Among other things, the audit related services and responsibilities of the Audit and Risk Committee include:

> • annually reviewing the Audit and Risk Committee charter and the committee's performance;

> • appointing, evaluating and determining the compensation of our independent auditors;

> • reviewing and approving the scope of the annual audit, the audit fee and the financial statements;

> • **reviewing disclosure controls and procedures, internal controls, internal audit function, and corporate policies with respect to financial information;**

> • **reviewing financial and other reports required by regulation and financial reporting requirements;** and

> • overseeing investigations into complaints concerning financial matters, if any.

**The Audit and Risk Committee also assists the Board of Directors in its oversight responsibilities relating to our assessment and management of risk.** Among other things, the risk related services and responsibilities of the Audit and Risk Committee include:

> • **reviewing our compliance management program**, information security policy, disaster recovery plans, regulatory reports made by the independent auditor or management and internal audit reports;

> • **overseeing our guidelines and policies that govern risk assessment and risk management**; and

*• reviewing other risks that may have a significant impact on our financial statements*.

The members of the Audit and Risk Committee are [defendant] Shackleton (Chair) and [defendants] Schaffer, Meyer, Glovier and Cicirelli, each of whom is financially sophisticated, as defined pursuant to the rules of The Nasdaq Stock Market, and independent, as defined pursuant to the rules of The Nasdaq Stock Market and Rule 10A-3 of the Exchange Act. Our Board of Directors has determined that Mr. Shackleton is the audit and risk committee financial expert, as that term is defined in Item 407(d) of Regulation S-K under the Exchange Act.

\* \* \*

*Directors' Loan Committee*. **The Directors' Loan Committee is responsible for overseeing our credit and lending strategies and objectives.** The members of the Directors' Loan Committee consist of Mr. Schaffer (Chair) and Messrs. Gordon, Sanchez, Shackleton and Meyer. If elected, Mr. Allison will replace Mr. Sanchez as a member of the Director's Loan Committee.

66.     Defendants' statements misleadingly suggested that: (i) the Board maintained sound corporate governance principles, as well as adequate compliance, internal controls, disclosure review to mitigate wrongdoing and apprise the Board of significant risks; and (ii) the Audit and Risk Committee adequately reviewed the Company's financial statements and disclosures, and monitored disclosure and internal controls to ensure they were effective.  The Proxy omitted any disclosures regarding the Company's: (i) material weakness in its internal controls over financial reporting; (ii) inadequate underwriting standards and/or a subpar credit culture; (iii) inability to adequately manage the significant risks associated with its low quality loans; and (iv) inadequate disclosure controls which failed to correct or prevent repeated misrepresentations concerning the Company's business and prospects.

67.     The Proxy harmed Opus by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of the Individual Defendants' misleading statements in the Proxy,

Opus' stockholders voted to reelect defendants Meyer and Rice, and elect defendant Allison to Opus' Board.

## **<u>THE TRUTH SLOWLY EMERGES</u>**

68.     On October 17, 2016, Opus began partially disclosing the truth about its struggling loan portfolio when the Company issued a press release titled "Opus Bank Announces Loan Charge-Offs Will Impact Third Quarter Earnings."  The press release revealed that the Company's third quarter earnings would include a $0.59 per diluted share  impact from loan charge-offs of $38.8 million, and that the charge-offs were expected to result in a net loss of approximately $0.05 per diluted share for the third quarter of 2016. The press release stated:

> As part of the credit review process of impaired loans, new developments supported charge-offs being recognized on eight loan relationships through the allowance for loan losses at September 30, 2016.... ***Charge-offs for the eight loan relationships totaled $38.8 million....  In addition, these charge-offs increased the reserve levels recorded against the remaining portfolio by $13.6 million*** as a result of higher loss factors incorporated into our allowance for loan loss methodology to reflect charge-offs in the third quarter of 2016.
>
> Two loan relationships originated by our Technology Banking division, which we previously announced would be deemphasized, contributed $22.2 million, or 57%, of the charge-offs and $8.1 million, or 60%, of the increased reserves as a result of higher loss factors. The remaining six loan relationships that had $16.6 million of charge-offs were from across our Commercial and Specialty Banking divisions. These eight loan relationships had a remaining balance of $19.1 million as of September 30, 2016 and have been charged off to the estimated fair value of each loan's underlying collateral.

69.     On this news, Opus' market capitalization plunged more than 21%, or $7.25, on October 17, 2016, to close at $27.20 per share compared to the previous trading day's closing of $34.45 per share, erasing over ***$248 million*** in market capitalization in a single day.  Unfortunately, as detailed below, for the next several months the Individual Defendants continued to mislead investors by repeatedly

misrepresenting that the charge-offs concerned "new developments" with respect to each of the eight deteriorating loan relationships noted above.  In fact, however, as Opus was ultimately forced to admit, the Company's loan portfolio had been deteriorating for over a year and Opus' credit infrastructure needed to be significantly revamped.

70.    On October 19, 2016, Opus held a "listen only" Investor and Analyst Conference call concerning the loan  charge-offs.  During the call, the defendants refused to take live questions, and instead read prepared questions and answers that were designed to obscure the full extent of the Company's struggles while also and improperly assuring investors that: (i) Opus maintained adequate controls and provisions for loan losses; (ii) the losses were due to recent developments; and (iii) the Company was further enhancing controls to prevent similar problems going forward. The Conference Call transcript stated:

> **1.    Have you been adequately provisioning for loan losses and can you explain the reserving methodology?  [defendant Carrillo]**
>
> > *We believe we have been consistently and adequately provisioning for loan losses by applying a methodology that has been reviewed by our regulators and our internal and external auditors.*
>
> * * *
>
> **4**.    **Were the charge-offs caused by collateral issues? [defendant Carrillo]**
>
> > *There was deterioration in the underlying financial performance of the client for each of these loans that led them to be viewed as collateral- dependent*. The shortfall between the collateral value, measured through independent third-party appraisals, enterprise value assessment, or liquidation values, and the loan balance triggered a charge-off when a loss event was confirmed during the third quarter.
>
> * * *

**6.     What divisions were the eight loan relationships with charge-offs part of? [defendant Allison]**

*The charge-offs during the third quarter were comprised of $23.4 million from Technology Banking, $7.5 million from Healthcare Banking, specifically our Practice group, not our Provider loans, $7.1 million from our Commercial Banking division and $2.0 million from Corporate Finance.*

**7.     What were the inflows and outflows within total criticized loans that led to the flat quarter-over-quarter level? What risk grading migration took place during the quarter? [defendant Carrillo]**

Total criticized loans increased by $914,000 quarter-to-quarter. The net change was driven by charge-offs, which reduced the balance by $40 million, upgrades, which reduced the balance by $21.0 million, and downgrades, which increased the balance by $62.0 million. ***The downgrades of $62.0 million were primarily comprised of two loans totaling $23.3 million from Technology Banking, two loans totaling $15.0 million from Commercial Banking, one loan totaling $8.5 million from Healthcare Banking and one loan totaling $11.6 million from Structured Finance.*** Only one loan migrated to substandard, which was from Technology banking.

* * *

**10.     What changes are being made going forward in terms of processes and structure?  [defendant Gordon]**

*We've committed to specific enhancements to our loan processes, credit monitoring, approval and review, which will be, in part, accomplished through the dedication of deeper talent and resources.* Examples of numerous improvements we will be making include, but are not limited to, *bifurcating the chief credit officer role into two separate roles: a chief credit officer dedicated to our commercial real estate lending activities and the addition of a chief credit officer dedicated to our commercial and specialty banking C&I focus. We are also going to be lowering our in-house maximum hold limits*, which we believe will reduce the risk of single event impact, ***and***

*lowering approval authority levels*, which we believe will *increase scrutiny and oversight in the credit approval process*.

71.     Given the Individual Defendants' previous statements touting the Company's purportedly "stringent underwriting criteria and monitoring procedures," the market was shocked by the revelation that Opus now needed "enhancements to [its] loan processes, credit monitoring, approval and review."  On this news, Opus' market capitalization plunged more than 11.6%, or $3.17, on October 19, 2016, to close at $24.13 per share compared to the previous trading day's closing of $27.30 per share, erasing over **$108 million** more of the Company's market capitalization.

72.     On October 24, 2016, Opus issued a press release announcing the Company's third quarter earnings, which included a net loss of $3 million, or a $0.09 loss per diluted share.  The $0.09 loss was $0.04 more than the Company originally announced just a week earlier in its October 17, 2016 press release.  The press release explained that the increased net loss was the result of increased reserves relating to the adequacy of allowance for loan losses.  The press release, however, failed to disclose the full extent of Opus' problems, stating:

> As previously announced on October 17, 2016, earnings for the third quarter of 2016 were negatively impacted by charge-offs recorded on eight loan relationships that reduced the third quarter net income by $0.59 per diluted share. ***Subsequent to our October 17, 2016 press release that included an estimate of an approximate $(0.05) loss per share, management completed its analysis of the adequacy of the allowance for loan losses and increased specific reserves by $1.7 million, which increased the net loss announced on October 17, 2016 by $0.04 per share***. As previously announced, given the net loss, Opus will not be paying a dividend in connection with the third quarter. It is our intention to resume paying a dividend commensurate with our future earnings performance.
>
> ***In our Question and Answer presentation filed on October 19, 2016, we noted a previously mentioned technology loan had shown improved trends and we had received a third party valuation during the third quarter which supported the release of the specific reserve***

*previously recorded for that loan. As management finalized its assessment process of the adequacy of the allowance for loan losses – work that was not yet completed as of October 19, 2016 – it determined to maintain a specific reserve for this loan in the amount of $1.7 million.* This specific reserve increased our net loss for the quarter ended September 30, 2016 to $(0.09) per share from the approximate $(0.05) per share that we had previously estimated and disclosed in our press release on October 17, 2016.

73.     The same day, Opus' market capitalization tumbled again, falling 8% to $21.30 per share compared to the previous day's close of $23.16 per share, erasing another $63.7 million in market capitalization.

74.     On November 9, 2016, Opus filed with the FDIC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2016, signed by defendants Gordon and Carrillo.   In stark contrast to the Individual Defendants' repeated misrepresentations concerning Opus' internal controls and credit risk assessments, the Form 10-Q disclosed for the first time that Opus had ***"identified a material weakness in its internal controls over financial reporting… related to inadequate review of the allowance for loan losses for impaired loans."***   The Form 10-Q further revealed that:

*…The root cause of the material weakness relates both to risk assessment, as management did not effectively enhance the control activity when the portfolio of impaired loans changed in both quantity and credit risk profile, and control environment, as a proper response to the evolving risk would have been for management to have more experienced personnel review the allowance for loan losses for these impaired loans. Specifically, management identified a lack of knowledge of relevant regulations around the identification of charge-offs on impaired loans, ineffective review over the evaluation of specific reserves and/or charge-offs on impaired loans, and inadequate support for assumptions used in the determination of the allowance for loan losses of impaired loans.* Following its identification of this material weakness, the Company initiated and completed a review and assessment of the impaired loans and correspondingly, the appropriateness of the allowance for loan losses as of September 30, 2016. The impact to the financial statements were recorded prior to the issuance of the Company's September 30, 2016

consolidated financial statements in this Quarterly Report on Form 10-Q. No restatement of prior period financial statements and no change in previously issued financial results were required as a result of this material weakness.

*Management anticipates that remediation efforts will include, and not be limited to, an enhanced risk assessment process, particularly around areas subject to rapid change, the addition of relevant and skilled resources, realignment of existing reporting structures, participation in technical trainings and updates to existing or the creation of new internal controls, processes, policies, and procedures*.

75.     The above news had a minimal negative effect on Opus' stock price, given that the market was led to believe the material weakness related only to the third quarter of 2016. In fact, however, as the Company was forced to disclose a few weeks later, Opus' material weaknesses over financial reporting related to the inadequate review of the allowance for loan losses extended at least all the way back through the entirety of 2016. Worse, unbeknownst to investors, Opus' loan portfolio was continuing to deteriorate.

76.     On January 30, 2017, Opus shocked the market when the Company reported worse-than-anticipated fourth quarter earnings due to a growing pile of problematic loans resulting in further charge-offs and provisions for loan losses. The press release stated:

*Opus' fourth quarter 2016 earnings were impacted by a provision for loan losses totaling $69.5 million. The fourth quarter provision for loan losses was driven by the addition of $27.2 million for loan risk rating migration, $22.1 million for additional specific reserves on impaired loans and $19.2 million of net charge-offs recorded on impaired loans. The risk rating migration, specific reserve increases and charge- offs were concentrated in our commercial business loan portfolio, primarily in our Technology Banking, Healthcare Banking and Corporate Finance divisions.*

Stephen H. Gordon, Founding Chairman, Chief Executive Officer and President of Opus Bank, stated, *"We are deeply disappointed with the fourth quarter loss driven by credit deterioration in our*

*commercial business loan portfolio.* We take this very seriously and are acutely focused on addressing the related issues and restoring Opus to its historic levels of performance."

77.    During an earnings call the same day, the defendants and other Opus fiduciaries revealed that significant deterioration plagued a number of the Company's "enterprise value" loans, and that Opus had suspended new originations of these loans for the foreseeable future, thus all but confirming the substantial inadequacy of the Opus' underwriting and credit management practices.   The earnings call further revealed that the deterioration was not triggered by a "macro event" that occurred in the fourth quarter, but rather that there was an inherent problem with Opus' product. For example, as explained by Brian Fitzmaurice, Opus' new Senior Executive Vice President and Chief Credit Officer:

> *During the fourth quarter we saw rapid deterioration in the financial performance of a group of commercial business loans that led to risk-rating downgrades, loan impairments and loan charge-offs. This occurred in both previously identified and new problem loans. Deterioration was largely seen within our specialty commercial banking divisions, specifically technology banking, healthcare banking, and corporate finance, and was concentrated in loans that had been underwritten based on projected cash flow or enterprise value of the underlying business. I'll refer to these as enterprise value loans.*

> The purpose of many of these loans was to provide financing or refinancing of a loan or loans used to purchase a business or assets, fund a dividend, or working capital loans for technology companies which had not yet achieved consistent positive operating cash flow. In many cases these loans contained risks associated with the execution of the business plan necessary to achieve projected cash flows to service the debt. *We have suspended new originations of these types of loans for the foreseeable future.*

> *As of December 31, 2016, there were approximately $915 million of enterprise value loans outstanding, excluding our institutional syndication loans. The risk-rating change, impairments and charge-offs that occurred in the fourth quarter were driven by Company-*

*specific challenges in their underlying businesses, changes in financial circumstances, or both.*

\* \* \*

[Analyst:] …And then based on what you described as the process of review, you guys said that there was significant deterioration in certain loans during the quarter. *Is this something that is triggered by a macro event or something? How did the deterioration occur in the fourth quarter? Or was it something that was inherent in the loan that was discovered through the process of evaluation?*

[Fitzmaurice] It was generally, I was reviewing loans with the data, the files were comprehensive and up-to-date. So, I looked at the data at hand. Again, *it runs to the product. These are smaller EBITDA companies that can be significantly impacted with a modest event.* In some cases it was the resolution of litigation, it was the loss of a client, a change in business model that impacted revenue.

*Those are pretty much the drivers. I think, again, it's more the product than a macro event. It's the fact that these companies were smaller with less capital to absorb an issue.*

78.     On the above news, Opus' share price plummeted 25%, to close at just $20.40 per share, down $6.85 from the previous trading day's closing price of $27.25 wiping out another *$221.1 million in market capitalization*.

79.     On March 13, 2017, Opus filed with the FDIC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2016 (the "2016 Form 10-K"). The 2016 Form 10-K was signed by Officer Defendants Gordon and Carrillo, and Director Defendants Gordon, Cicirelli, Meyer, Bowers, Glovier, Schaffer, Shackleton, and King. The 2016 Form 10-K finally confirmed what was already suggested by the above disclosures: for the entire 2016 fiscal year, Opus had an inadequate internal credit review process, material weaknesses in reporting related to the Company's credit review function, material weaknesses in its review of allowance for loan losses for impaired loans. The 2016 Form 10-K stated:

*…The material weakness relates to inadequate review of the allowance for loan losses for impaired loans and inadequate scope of the internal Credit Review function. The root cause of the material weakness relates both to risk assessment and control environment. With respect to risk assessment, management did not effectively enhance its review of impaired loans as they increased in both quantity and credit risk, while internal Credit Review did not sufficiently adjust the nature and extent of its credit review plan as credit quality in the loan portfolio began deteriorating.* With respect to control environment, the Company did not have sufficiently qualified personnel reviewing impaired loans. Specifically, management identified that there was inadequate knowledge of relevant regulations around the identification of charge-offs on impaired loans, ineffective review over the evaluation of specific reserves and/or charge-offs on impaired loans, and inadequate support for assumptions used in the determination of the allowance for loan losses on impaired loans. Further, *the internal Credit Review function did not have a process in place to make timely changes to their review scope and procedures as credit quality began to deteriorate.*

The Company has concluded that *in 2016 this deficiency could have resulted in a material misstatement of the consolidated financial statements that would not have been prevented or detected on a timely basis*, and as such, this control deficiency results in a material weakness.

80.     The market's reaction to the above news was less severe than it was in response to the previous revelations, given that the 2016 Form 10-K largely summarized the slow trickle of negative revelations that began in October 2016 and continued for several months thereafter.  Nonetheless, the Company's stock price fell another 1.49% on the day the 2016 Form 10-K was filed, falling to $19.90, erasing another $11.1 million in market capitalization.

## REASONS THE STATEMENTS WERE IMPROPER

81.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     Opus lacked adequate internal controls over accounting and financial reporting;

(b)     Opus held a number of poor quality loans due to inadequate underwriting standards and/or a subpar credit culture;

(c)     Opus was unable to maintain robust controls and credit monitoring throughout the substantial growth the Company was experiencing;

(d)     Opus was not properly accounting for its loans;

(e)     Opus would be forced to recognize large charge-offs associated with its low quality loans; and

(f)     as a result of the foregoing, the Individual Defendants' representations concerning Opus' business and operations were improper.

## **DAMAGES TO OPUS**

82.     As a result of the Individual Defendants' improprieties, Opus disseminated improper, public statements concerning the Company's business and operations.  These improper statements have devastated Opus' credibility as reflected by the Company's ***$522 million***, ***or 44.2%, market capitalization loss*** between October 14, 2016, the last trading day before the truth began to emerge, and January 30, 2017, the day most of the truth was finally revealed.

83.     Opus' performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Opus' current and potential customers consider a company's ability to accurately value its business prospects and risks.  Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions.  Opus' ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

84.     Further, as a direct and proximate result of the Individual Defendants' actions, Opus has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying the proposed $17 million settlement in the class action for violations of federal securities laws; and

(b)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Opus.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

85.     Plaintiff brings this action derivatively in the right and for the benefit of Opus to redress injuries suffered, and to be suffered, by Opus as a direct result of violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Opus is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

86.     Plaintiff will adequately and fairly represent the interests of Opus in enforcing and prosecuting its rights.

87.     Plaintiff was a stockholder of Opus at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Opus stockholder.

88.     The current Board of Opus consists of the following nine individuals: defendants Gordon, Glovier, Meyer, Schaffer, Cicirelli, Bowers, and King, and nondefendants Paul G. Greig and Richard C. Thomas.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Gordon, Glovier, Meyer, Schaffer, Cicirelli, Bowers, and King Face a Substantial Likelihood of Liability for Their Misconduct**

89.     The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations.  Defendants Gordon, Glovier, Meyer, Schaffer, Cicirelli, Bowers, and King face a substantial likelihood of liability for repeatedly failing to comply with this duty.

90.     As alleged above, four of the nine current Board members, including defendants Gordon, Glovier, Meyer, and Schaffer, as members of the Directors' Loan Committee, utterly failed to adequately "oversee the Bank's credit and lending strategies" or "develop and achieve [adequate] credit and lending goals of the Bank." As a result of these breaches, Opus: (i) held a number of poor quality loans due to inadequate underwriting standards and/or a subpar credit culture; (ii) was unable to maintain robust controls and credit monitoring throughout the substantial growth the Company was experiencing; (iii) was not properly accounting for its loans; and (iv) was ultimately forced to recognize large charge-offs associated with its low quality loans.  Accordingly, defendants Gordon, Glovier, Meyer, and Schaffer breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, defendants Gordon, Glovier, Meyer, and Schaffer face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

91.     Four of the nine current Board members, including defendants Gordon, Glovier, Schaffer, and Cicirelli, violated section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the Proxy.  Seven of the nine current Board members, including defendants Gordon, Glovier, Meyer, Schaffer, Cicirelli, Bowers, and King, further breached their fiduciary duties of loyalty by causing or allowing improper statements to be made in the Company's press releases and FDIC filings regarding Opus' business, operations, and prospects.  Accordingly,

1 demand is excused because a majority of the Board faces a substantial likelihood of

2 liability.

3      92.    Five of the nine current Board members, including defendants Glovier,

4 Meyer, Schaffer, Cicirelli, and King, as members of the Audit and Risk Committee,

5 caused or allowed Opus to operate with a material weakness in its internal controls

6 over financial reporting, including with respect to risk assessment and the Company's

7 control environment.  As members of the Audit and Risk Committee, these defendants

8 also reviewed and approved the improper statements and earnings guidance.  The

9 Audit and Risk Committee's Charter provides that it is responsible for "overseeing the

10 operation of a comprehensive system of internal controls covering the integrity of the

11 Bank's financial statements and reports, compliance with laws, regulations, and

12 corporate policies," and for "fulfilling its oversight responsibilities relating to the

13 Bank's assessment and management of risk."  Thus, the Audit and Risk Committee

14 Defendants were responsible for knowingly or recklessly failing to fulfill its oversight

15 duties with respect to risk, and for allowing the improper statements related to the

16 Company's earnings guidance and financial and disclosure controls.  Moreover, the

17 Audit and Risk Committee Defendants reviewed and approved the improper press

18 releases made to the public.  Despite their knowledge or reckless disregard, the Audit

19 and Risk Committee Defendants caused these improper statements.  Further, as a result

20 of these defendants' improper actions, Opus: (i) held a number of poor quality loans

21 due to inadequate underwriting standards and/or a subpar credit culture; (ii) was unable

22 to maintain robust controls and credit monitoring throughout the substantial growth the

23 Company was experiencing; (iii) was not properly accounting for its loans; and (iv)

24 was ultimately forced to recognize large charge-offs associated with its low quality

25 loans.   Accordingly, the Audit and Risk Committee Defendants breached their

26 fiduciary duty of loyalty and good faith because they participated in the wrongdoing

27 described herein.  Thus, defendants Glovier, Meyer, Schaffer, Cicirelli, and King face

28

a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

93.     Plaintiff has not made any demand on stockholders of Opus to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Opus is a publicly traded company with over 35.9 million shares outstanding, and thousands of stockholders as of November 3, 2017;

(b)     making a demand on such a large number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against Defendants Sanchez, Rice, Allison, Gordon, Meyer, Shackleton, Schaffer, Cicirelli, Glovier, and Alvarado for Violation of Section 14(a) of the Exchange Act**

94.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants Sanchez, Rice, Allison, Gordon, Meyer, Shackleton, Schaffer, Cicirelli, Glovier, and Alvarado.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

96.     Defendants Sanchez, Rice, Allison, Gordon, Meyer, Shackleton, Schaffer, Cicirelli, Glovier, and Alvarado negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders

which were contained in the Proxy.  The Proxy contained a proposal to Opus' stockholders urging stockholders to reelect defendants Meyer and Rice to the Board, and elect defendant Allison as the new management representative on the Board.  The Proxy, however, misrepresented and failed to disclose that: (i) Opus was operating with a material weakness in its internal controls over financial reporting; (ii) the Board caused or allowed inadequate underwriting standards and/or a subpar credit culture; (iii) Opus lacked the ability to adequately manage the significant risks associated with its low quality loans; and (iv) the Board caused or allowed inadequate disclosure controls which failed to correct or prevent repeated misrepresentations concerning the Company's business and prospects.  By reasons of the conduct alleged herein, defendants Sanchez, Rice, Allison, Gordon, Meyer, Shackleton, Schaffer, Cicirelli, Glovier, and Alvarado violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Opus misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Opus' recommendation to reelect defendants Meyer and Rice to the Board, and elect defendant Allison as the new management representative on the Board.

97.     The misleading information contained in the Proxy was material to Opus' stockholders in determining whether or not to reelect defendants Meyer and Rice to the Board, and elect defendant Allison as the new management representative on the Board.  This information was also material to the integrity of the directors that were proposed for election to the Board.  The Proxy solicitation process in connection with the Proxy was an essential link in the reelection and election of these nominees to the Board.

98.     Plaintiff, on behalf of Opus, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy in connection with the improper reelection and election of the members of the Board.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

99.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.   The Individual Defendants owed and owe Opus fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Opus the highest obligation of good faith, fair dealing, loyalty, and due care.

101.   The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Opus, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

102.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) Opus lacked adequate internal controls over accounting and financial reporting; (ii) Opus held a number of poor quality loans due to inadequate underwriting standards and/or a subpar credit culture; (iii) Opus was unable to maintain robust controls and credit monitoring throughout the substantial growth the Company was experiencing; (iv) Opus was not properly accounting for its loans; (v) Opus would be forced to recognize large charge-offs associated with its low quality loans; and (vi) the Individual Defendants' representations concerning Opus' business and operations were improper.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

103.   The Director Defendants, as directors of the Company, owed Opus the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein.  The Director Defendants knew or were reckless in not knowing that: (i) Opus lacked adequate internal controls over

accounting and financial reporting; (ii) Opus held a number of poor quality loans due to inadequate underwriting standards and/or a subpar credit culture; (iii) Opus was unable to maintain robust controls and credit monitoring throughout the substantial growth the Company was experiencing; (iv) Opus was not properly accounting for its loans; (v) Opus would be forced to recognize large charge-offs associated with its low quality loans; and (vi) the Individual Defendants' representations concerning Opus' business and operations were improper.   Accordingly, the Director Defendants breached their duty of loyalty to the Company.

104.   The Audit and Risk Committee Defendants breached their fiduciary duty of loyalty by knowingly or recklessly failing to fulfill their oversight duties with respect to risk, and for allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.   The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

105.   The Directors' Loan Committee Defendants breached their fiduciary duty of loyalty by knowingly or recklessly failing to adequately oversee the Bank's credit and lending strategies and failing to develop and achieve adequate credit and lending goals of the Bank.

106.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Opus has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

107.   Plaintiff, on behalf of Opus, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

108.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.   As a result of the wrongdoing detailed herein and by failing to conduct proper supervision, the Individual Defendants have caused Opus to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

110.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

111.   Plaintiff, on behalf of Opus, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

112.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Opus.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Opus.

114.   Plaintiff, as a stockholder and representative of Opus, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

115.   Plaintiff, on behalf of Opus, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Opus, demands judgment as follows:

A.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.   Directing Opus to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to

protect Opus and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

       1.     a proposal to strengthen the Company's controls over financial reporting, including with respect to the evaluation of reserves and allowances for loan losses;

       2.     a proposal to strengthen the Company's controls over risk assessment, credit risk profiles, and overall control environment;

       3.     a proposal to strengthen Opus' oversight of its disclosure procedures;

       4.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

       5.     a provision to permit the stockholders of Opus to nominate at least three candidates for election to the Board;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Opus has an effective remedy;

D.     Awarding to Opus restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated: December 14, 2017

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
STEVEN R. WEDEKING

*/s/Brian J. Robbins*
BRIAN J. ROBBINS

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
csmith@robbinsarroyo.com
swedeking@robbinsarroyo.com

Attorneys for Plaintiff

1225999

## VERIFICATION

I, Michael Scott, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _Dec, 13, 2017_

_____
MICHAEL SCOTT